Mr. Walker. Yes, sir. May it please the court. My name is Eric Walker and I represent the plaintiff appellate Patricia Perryman. The summary judgment on limitations in this case should be reversed for on either of two issues. Wholly independent issues, discovery rule and fraudulent concealment. This is the 15th case over an eight-month period in which this court has considered the limitations issue in a transvaginal mesh case. In all 14 of the previous cases, this court has found a question of fact. 13 of those cases involved OB tape or OB tape, the product at issue here. What was the 15th case, the one we certified to the Texas Supreme Court? I'm sorry, Your Honor. In one of the cases, though, we certified the case to the Texas Supreme Court. Is that correct, Bergen? And I'm not referring – I'm not even including that in these cases. The 13 cases I'm speaking of are the Rogers case, which consolidated 12 other cases. There was no certification. You're saying we've been unified on a position. You're not entirely correct. The Bergen case, we weren't certain what the answer was and we certified to the Texas Supreme Court. That's correct, Your Honor. I guess what I'm saying is in the instances where this court has ruled on the issue, it has ruled unanimously in favor of there being a question of fact on the limitations issue. Thirteen times in OB tape cases, this court reversed the summary judgment of the MDL court on limitations. Now, those cases were under Minnesota law, but Minnesota law is very similar to the Florida law. Well, isn't your strongest argument not what we've done 13 times, but that one of the times – I can't pronounce this correctly – Agni-Yim, didn't we rule in a way that's quite helpful to your position here? It did. That wasn't one of the 13 OB tape cases, Your Honor. Why don't you tell us about this case right now? Yeah, about this particular case. Yes. Yes, Your Honor, I will. This case involves facts identical to the Agni-Yim case, essentially. In this case, Patricia Perriman had OB tape implanted, and shortly after implantation, she began to suffer the same injuries that the Agni-Yim case, in which this court affirmed a jury verdict for the plaintiff on statute of limitations, experienced. Those injuries were infection, erosion of the mesh, protrusion of the mesh from the vagina, vaginal pain, and dyspnea, pain during intercourse. Precisely the same injuries that are at issue here, and that this defendant says should have started the prescriptive period, but this court said did not in Agni-Yim. Also, this plaintiff in this case was told that if the mesh was removed, it would alleviate her symptoms. Again, a fact this defendant says should have started the prescriptive period, but this court said in Agni-Yim did not. Dr. Patel, the surgeon who implanted the device in Ms. Perriman, and was her first treating surgeon for her injuries, said he thought that the injuries she experienced were either caused by vaginitis, thin vaginal wall, or possibly the surgery used to implant the device. In Agni-Yim, this court found that a belief that the surgery, rather than the product, might have been the cause of the injuries was enough to create a fact issue. In particular, the plaintiff in that case acknowledged that she thought that mesh repair was responsible for her injuries, and this court found that mesh repair is equally susceptible to an interpretation that the surgery caused the injuries as it was to the notion that the product caused the injuries. So this case is on all fours with Agni-Yim. Both are under Florida law, and there would be no way to reconcile a ruling for the defendant in this case with what the court held in Agni-Yim. Or in the 13 other cases which are under Minnesota law, which is essentially the same law. Discovery rule, knowledge of cause, knowledge of injury. But more importantly, Your Honor, is the Ballou v. A.H. Robbins case. By the way, Agni-Yim was published. It's less than two months old. There's also the Alvarado case that this court decided just a few weeks ago in favor of the plaintiffs, reversing the summary judgment order. But there's also the Ballou v. A.H. Robbins case from the 1980s. That case also involved a vaginal device, an IUD, implanted in a plaintiff. The plaintiff immediately experienced an infection. She actually suspected the IUD might be responsible for infection and asked her doctor if that was the case. The doctor says, I don't know what caused your problem. I don't know if it's the cause or not. This court found a fact issue, saying that there was no evidence that the plaintiff had any reason to know the IUD caused her infection, notwithstanding the temporal relationship between the IUD implantation and the injuries, and notwithstanding that the doctor said, I'm going to remove the IUD to alleviate your suffering. None of those facts were deemed dispositive on what she knew about causation. More significantly, those facts were actually more favorable to the defendant than these facts. The plaintiff in Ballou, this court's decision that I believe has been cited 169 times, that plaintiff actually suspected the IUD caused her injuries and asked her doctor if it did. Our plaintiff never suspected until she saw the television program that the OB tape was responsible for her injuries. The doctor in Ballou said, I don't know. Well, she in all these cases, the patient knows there's some connection between the mesh. But not a causal connection. Well, even a causal connection, but what the plaintiff does not know is that the mesh was necessarily defective. She knows that maybe she's allergic to it. Maybe she rejected it. Maybe something happened. But she doesn't necessarily know that the mesh was a defective product. Isn't that what the absence of knowledge pertains to? Defective or causally related. In fact, in the Rogers case, that was the 12 consolidated cases, this court noted that the plaintiff was focusing on the word defect. And the court says, we don't think defect is the real issue. It's causative relationship. Sure, the mesh was related to the injuries. It's beyond question that it was the mesh protruding from the mesh. But if she didn't have the same symptoms beforehand and you had different ones afterwards, then there's an inference that that's what causes it. Well, no, Your Honor. It just means that that's something involved in it, but not the cause of it. If she had a prior infection or if the surgeon had made a mistake in the surgery, if he'd implanted the mesh in the wrong place, it would have been the surgeon's misconduct or the surgeon's error. Whatever the case, the mesh is implanted. And that's the difference. I'm sorry, Your Honor. The mesh has been implanted and you have a change in circumstances, physical circumstances. Almost immediately, right, which could have been a result of the surgery, the body's rejection of any foreign object, whether it be mesh or something else. Or take the easiest case in the cases of infection. It could have been a failure of sterility. It could have been a number of different factors unrelated to the mesh itself. It could have been a failure of sterility with respect to the device, which would not have been, even more likely than not, a failure of the product, a defect of the product. It could have been a defect in the maintenance of sterility in the operating field. Absolutely, Your Honor. The mesh may not have had anything to do with the cause of the injury. The presence of the mesh may have aggravated an injury caused by something, not even aggravated, but may have been involved in the injury itself, but not at a causal level. I mean, the analogy I think of is if you're in a car accident and a drunk driver runs you into a median barrier, you have a lawsuit against the drunk driver the minute you're injured. But you don't have an obligation to start suing the carmaker and the tire maker and the seatbelt maker and the airbag maker and the maker of the median on the highway and the thought that those may have been involved in the injury, undeniably. But they're not the cause of the accident or the cause of the injuries, unless something comes up later that says the median was too soft or the tires weren't working properly. But absent that, we would have people running to the courthouse and suing everyone who made anything that had anything to do with their injury, including the people who manufactured the equipment used in the surgery itself. The bottom line is that there's... You're doing it. You're right. The case law seems to be going your way. But you do recognize a logical consequence of your argument is that essentially there's really no statute of limitations anymore for these kind of things. People can wait around 5, 10, 15, 20 years until somebody else decides to bring a lawsuit and it's on TV. There's really, as a practical matter, no statute of limitations anymore, correct? Not at all, Your Honor. If any of these doctors had told her that this was the cause of her injuries, then she would have had went on notice to file suit.  I'm sorry? The doctors are telling her what's wrong because they're treating her. Well, no, they're saying to her, if we remove whatever, because of this... Well, I mean, the point of the matter is she comes in with symptoms after the implant. And all kinds of symptoms, and they're treated. And the doctor says... And one thing leads to another. And the doctor says, I could remove this mesh and that would relieve your symptoms. But I could have an infection caused by some kind of drug and somebody could say, I'm going to remove your finger because that's where the infection... The argument is, if you have multiple possibilities of a cause, the statute doesn't run. No, I'm not saying that, Your Honor. I'm saying there was no evidence here in her mind, and there had no reason to be, that the mesh was one of those causes. It was incidentally related to the injuries in the sense that because it was there, whatever was causing her injury caused the mesh to produce some pain. But not that the mesh was the cause of her injury. Any more than the highway barrier that you run into, while obviously involved in your injuries, was the cause of your injuries. And in this case, however, if the doctor had implicated mesh, that would be one thing. But because of fraudulent concealment by the defendants, these three doctors didn't know until they were deposed after she filed her lawsuit that mesh even caused these kinds of injuries. Now, the defendant says Dr. Patel actually specifically told her that the mesh was causing her pain. That is not what the record shows. Dr. Patel said he doesn't remember any conversation with her at all. He also said he thought her problems were caused by either vaginitis or surgery. He did say at one point that he thought that the presence of the mesh was causing pain based on whatever caused her injuries and that she should have the mesh removed. But that's a far cry from causation, as this Court held in Rogers and Alvarado and in Egnehem. And Ms. Well, if the cause of the problem is the mesh, then you either have malpractice or a defective product. I'm sorry, Your Honor. I say it seems to me that you either have malpractice, the doctor shouldn't have put it in there in the first place, or it's a bad product. Well, or there could be something— It's kind of narrowed down at that point. Or there could have been something wrong with her body that no one was responsible for. In which case, well, the doctor should have maybe anticipated it. Right. She may have no lawsuit in that instance. I understand. Your Honor, we also ask that the Court consider fraudulent concealment, and I'll listen to the arguments carefully that the defendant has and respond in my rebuttal. I see my time is up. Unless the Court has any more questions. We'll hear from Mr. Lewis. May it please the Court, Your Honors. This is the first time that this Court has ever had a case regarding the Florida statute of limitations where the testimony was so clear from the plaintiff herself that she knew and understood that the product had caused her injuries at a point in time outside the statute of limitations. And I want to cite for the Court exactly what the plaintiff said in her sworn testimony after having a lawyer prep her, file a case on her behalf, her deposition was taken. And she was asked, the reason you wanted the obtape removed in November of 2005 is because you believed it was causing pain with sex. Her answer was, and the infections. She added and the infections to that question. So the lawyer followed up and asked her again. So at this point in November of 2005, you understood that obtape was causing both pain with sex and the infections. And her answer was, and the infections wouldn't go away, yes. That's page 123 of her deposition transcript, which is part of the record. That was in November of 2005, where she testified that she knew and understood that the obtape was causing her injuries. She didn't file a lawsuit for eight years until 2013. The argument, I think, is that she may have known it was causing the problems, but she did not know that there was any defect or problem with the product. Maybe she was allergic to it, maybe it was a foreign body. And is that argument, if that is the argument, is that sufficient then to carry the debt for the plaintiff? It is not under Florida law, Your Honor. And that's important in this case. This case is to be decided under Florida law. And under Florida law, a knowledge of a defect in the product is not required to trigger the statute of limitations. Well, can you have liability in the absence of a defect? Potentially. For what? Negligent conduct. So if the manufacturer, perhaps, was negligent in some way and the product was not necessarily defective, you could have liability. And is there any suggestion that that's a basis claimed by anybody here? Sure. I think there are typically negligent. All of these cases sort of have a menu of claims in them. Negligent design. Yes. Negligent failure to warn, as an example. So that doesn't necessarily mean that there's a claim that the product is defective. It was just that you failed to warn about the potential complications. Potential risk. Negligent design means defect, doesn't it? Essentially, yes. But negligent failure to warn doesn't necessarily mean defective product. So that's one instance. What about the distinct injury requirement in Florida law? You would argue that her symptoms were a distinct injury at this point? Absolutely. Under the Florida Supreme Court, in the Bogorff decision, that's a 91 Florida Supreme Court case. And by the way, Your Honors, that case, strikingly, was not mentioned in either of the papers filed by the appellant in this case. But that's the law. Bogorff is the law of Florida. That's a Florida Supreme Court case on statute of limitations in a product liability lawsuit. But according to Bogorff, I've got a fair number of cases that are hard to pronounce, so I apologize, but Bogorff, the question is, does the plaintiff have notice of the possible connection between the product and the injury? And you have notice if you've had an injury that is distinct or dramatic enough, and, of course, you're aware that you've been exposed to the product. Here there was a dramatic... And that there be a possible invasion of legal rights. Correct. Exposure does not, in and of itself, establish awareness of possible invasion of the plaintiff's legal rights, does it? That is not enough, correct, Your Honor. What you need is you need an injury that is distinct or dramatic enough and the exposure to the product. You need both. And you need enough information so that you are aware, constructively or actually, of a possible invasion of the legal rights, right? Correct. Correct. Correct. And beyond that... If someone had one of these tapes implanted, there was a dramatic change in condition because there you've had exposure and there you've had a dramatic change in condition. That alone doesn't do it. I would disagree, Your Honor. You think it does? I do. I think sort of.  Plaintiffs need only have notice through the exercise of reasonable diligence of the possible invasion of their legal rights. Correct. You're eliding that. No, I'm not. I'm saying Florida, including that court, Florida courts have said, what do we mean by having notice of a possible legal invasion of our rights? What do we mean by that? Here's what we mean by possible invasion of legal rights. We mean that you must have notice of an injury that is distinct and dramatic and exposure to a product. That's what we mean when we use that phrase. Well, then let's talk about Babush, which takes that language and then goes on to say, this speaks clearly to causation. That ingestion of the drug was a contributing cause of plaintiff's injuries. Right. You can't get simply from exposure plus a dramatic change of condition. Sure, because in Babush, this poor guy, he took a drug for a number of years and he experienced liver damage only after he stopped taking the drug, like a few months after. And the drug that he was taking was for cholesterol, and there was no suggestion that a cholesterol drug had anything to do with the liver. And he finds out a few months after he stops taking the drug, oh, I have liver damage. And there was nothing in the record to suggest he could ever put the two things together or even should have. So let me put this case to you. Plaintiff has an implant of some kind. Promptly thereafter, the plaintiff has a dramatic change in condition. Fever spikes. White cell count goes sky high. Sedimentation rate goes sky high. Every index of infection. Blood culture is done. Shows staph infection.  As to the product? As to the product? I'd probably need to know a little bit more information, but based on just those facts, Your Honor, I don't think so. What's missing? What the physicians were treating when she went in. And that's the critical distinction with this plaintiff. What they were treating at the time of the implant or what they were treating at the time it went bad, whatever it was? At the time that it went bad. So they're treating a raving infection. That's what they're treating. A general systemic infection is my understanding of how you describe the complications. Systemic infections all start somewhere. Exactly. And that's my point. If the doctors are focused on the product as the source of the infection during the treatment, like they were here. I mean, every time she went in, she went in to the doctor four or five times. And each time, the physicians honed in on one place, one place only, where the Optape was. And that's why she understood that that was causing the infections. She knew it. She understood it. And she testified. So it starts the statute on those facts. Absolutely. Absolutely. Absolutely does. And that's true. In Florida. I'm sorry. In Florida it does. In Florida. I want to be clear about that. Now, in Minnesota, under this court's ruling in Rogers, I think it's a closer call. I think you have to know a little bit more under Minnesota law than you do under Florida law. And when we look at all of the decisions in Florida, we can look at Trazolaw, Steiner, Oliver, which is Judge Goodwin in West Virginia who has another MeSH MDL, Perez, which is a Paxil case, Parcell, which is an Optape case decided by a Florida district court judge, we cited. All of those cases talk about possible causal connection. Is it on the menu of causes? Is it a possible causal connection? When you look at Minnesota law, you see nothing of that sort. You see nothing under the Minnesota cases that says possible connection. And this court concluded, and you also don't have a Supreme Court case in Minnesota, unfortunately. So with all due respect to this court, it had to piece together a lot of law from a lot of different places, including the 8th Circuit, to come up with a decision in Rogers. But there's a clear distinction between Minnesota and Florida law. Minnesota law, as this court held in Rogers, requires awareness of a causal connection. So the rule you're advocating, if adopted, if that really is Florida law, means that the first sign of trouble in Florida, you sue the manufacturer. Not the first sign of trouble. First sign of dramatic change of condition, sue the manufacturer, even if you have no reasonable basis to think that the product is actually defective and there are alternative hypotheses as to what's going on. Well, yes, but I don't think I'm positing a rule. That is the rule. When you look at the Bogor facts, this child had leukemia and was being treated with methotrexate, I believe. And in that particular case, they even went and saw a lawyer, and the lawyer told them, you don't have a claim against the product manufacturer. And then in addition, the physician threw them off the trail as well by saying that the product wasn't connected. And the Supreme Court of Florida said, the law in Florida is, if you have had a dramatic change in condition, which is absolutely what happened in that young child who had leukemia, had a dramatic change in his condition that was not expected. And if you know that you've been exposed to the product, that's it. That's the trigger. You have to start doing something. You can't sit on your couch and wait for a TV commercial. You must do something at that point in time. That's Florida law. Minnesota law is a little bit different. And some of these other jurisdictions are a little bit different. But I would urge this court to take a look at its decision way back related to Illinois law, which was the Curtis case. It was one of the first cases involving odd tape. Under Illinois law, where this court affirmed summary judgment. And in Curtis – Do you think we should certify this case to the Florida Supreme Court? I think if this court is going to – so the question is maybe. If this court is going to do anything other than hold that the requirements are injury that is distinct and dramatic and exposure to the product, given a possible connection, then it has to certify the issue. As I understand the problem here, your opponent says possible doesn't work. That doesn't start the clock running. Well, it's obvious that probable does. But that means you've got enough to file a lawsuit. So then the question becomes whether there's something in between. They say possible doesn't work, and probable does. But that means there's no barrier at all, because when you can state a case with probable cause, in other words, to bypass a malicious prosecution claim, that doesn't work because it writes the statute out of the picture. So the question becomes if it's not possible, then it has to be some point in between. And the question then becomes what kind of standard. And I'm familiar with the Florida cases, and I know about the possible part. I don't know how to write a definition of when in between possible and probable cause to withstand malicious prosecution charge, which means filing a suit. The clock starts running. Right. Isn't that the problem we have? If it's probable cause, that can't be, because that means there's no statute. So you have to flip somewhere in between of possible and enough to file a lawsuit. It starts running. I think that coin's already been flipped, Your Honors. I don't know how to express that in words. I think the coin's already been flipped by the Florida Supreme Court, and they said, hey, our rule is possible. That's it. We're sorry. Well, my interpretation of the Florida Supreme Court they could formulate a standard that's less than enough to file the lawsuit, but more than possible. I don't think they have. Counsel, maybe you could help me with this notion that if we were to conclude that a reversal is warranted here, there's no more statute of limitations. I take it you'd agree that if four years from today an identically situated plaintiff came in and filed suit and cited a reversal in this case as a basis for arguing that the statute hadn't accrued yet, your response would be something like this. Everybody's known about the product liability alleging that ObTape is defective for years. There's been an MDL for five, six, seven years. There's been all kinds of litigation about defects, and a plaintiff who was exercising reasonable diligence would certainly have known in 2017 that there was a very substantial case that it was a defective product, and the statute began to run no later than 2017. That would be your position, wouldn't it? May I answer Your Honor's question? My time's over. No later than 2017, absolutely. We've had an MDL in this litigation since 2008. Well, this is an argument about constructive knowledge. I don't know that constructive knowledge even plays a role in this. It can. So it's whether the plaintiff knew or should have known or discovered. The plaintiff's not a lawyer reading the law books. I'm sorry? I'm sorry? What I'm saying is the plaintiff is not a lawyer reading a law book so that you're charged with notice of what's going on in the universe about some product. The plaintiff might be somebody who watches TV all day, which you can't miss. You're charged with reasonable diligence, Your Honors. I think that's the standard. And even in Agnion, the plaintiff in that case testified. She did a bunch of research on her own in 2008 and 2009, right around the time that this MDL was formed. So reasonable diligence takes a plaintiff to the spot of knowing about a claim no later than 2008. Again, far outside the statute of limitations in this case, which is 2013 when the case was filed under a four-year statute. I see my time's up, Your Honors, unless there's any questions. Thank you, Your Honors. Mr. Walker. Yes, sir. Let me address that last argument in a second, but I want to correct the record on what the plaintiff actually testified to. In the series of questions that counsel cited, she was being asked about her sexual pain, and she wanted to emphasize that he kept ignoring infection. So he puts the word cause in the question. She says, but the infection, don't forget the infection. She's not answering, yes, I knew about causation then. She's saying, you've left out the infection, and that's an important thing to include. This is what she said on page 154 of her testimony. Question, when you started experiencing complications, the infections and erosions and pain, what did you think was causing them? Answer, well, I didn't know. I didn't know what caused it other than, and then I thought, well, maybe, you know, I was having an allergy to it or rejecting, you know, my body was rejecting it or something, something that could be easily corrected, have it taken out, and it wouldn't have it anymore. If there's a conflict, I don't even think there's a conflict in her testimony when you consider the excerpt counsel cited in context, but if there is, that's not for this court to decide or the court below. It's for a jury to decide. Now, with regard to this MDL question, the courts have pretty uniformly said that inquiries of a physician are due diligence, and in this case, she inquired of three different physicians. If three different physicians specialized in implanting and explanting, ob tape, didn't know these risks of ob tape, can we really attribute that knowledge to a lay person, and do we expect her to know about the creation of an MDL in 2008? We certainly don't expect her the minute she has some problems or pain to hire a lawyer and say go out and scour the universe for what may be potential causes. She didn't know she had the right to sue anybody. Do we ask people every time they experience a pain of some kind to go out and hire a lawyer and make sure there's not an MDL out there somewhere on it? Remind me in the record what did prompt her to sue then if it wasn't? It was the advertisements that had been proliferating on television, and I don't disagree that if there were a lawsuit filed at this point in time that there would be an argument that the cause of action had accrued by now. So is there some point, is it a year, two years, three years worth of commercials on TV at which point we can attribute knowledge to somebody? First commercial, maybe not enough. How do we set our time here? Certainly to the extent the plaintiff saw the commercial, I believe that would be true. It may very well be that this court can conclude that the commercials have become so pervasive that she was charged with that knowledge, although even that would require this court to assume that everyone, as Your Honor pointed out, watches TV, which is not necessarily true. There's nothing novel about this. There are probably 200 constructive knowledge cases involving securities fraud claims about when there's enough out there in the public press about a company's situation so that a plaintiff is charged with constructive knowledge of a misstatement. That may be true. There's no evidence in this record that there was any kind of publicity of that nature. I'm not suggesting that. You misapprehend the point of my question, which was to indicate that I'm very skeptical about an argument that a reversal here is the equivalent of abolishing the statute of limitations in OBTAPE cases. He's throwing a snowball. I'm sorry, Your Honor. A softball. That was a big, fat softball. I apologize, and I think that's true. There are myriad reasons that the plaintiff could know. Her doctors may told her. If her doctors had not been fraudulently deceived by the concealment that began before she took the product but continued long afterwards, which is all that's required by the law, not that the fraud occur after her injury, but that it continue after her injury. And here, none of her doctors knew these risks, even at the time they were deposed. So we have a plaintiff who, the defendant is saying, should have more knowledge than three different doctors who implant and explant OBTAPE, that she should have been aware of an MDL proceeding on the day it was created in 2008, that she should have somehow hired a lawyer to go out there and scour the records to see what existed. And that's certainly not what the law requires in this instance. The defendant claims we don't— Certainly the constructive knowledge argument would be open to your adversary in the event they were remanded here, right? Certainly, and I think a jury could very well agree with him. A jury could agree with him. The Borgdorf decision has been interpreted by every appellate court in Florida as requiring knowledge of a causal relationship. Every case defendant cites says the same thing. The Steiner v. Sibagiba case, St. Petersburg v. Total Containment, Walls v. Armour Pharmaceuticals, all cases cited by the defendant, all saying knowledge of a causal relationship is required. That's why the court said that the injury has to be something distinct and unusual from the plaintiff's condition. How close is that to probable cause? I'm sorry, Your Honor? How close is that to probable cause? Well, I think it has to be knowledge of a substantial— Is it close enough to file a lawsuit? Probably, or close enough at least to investigate. That's my problem. Well, here there was no knowledge of any causal relationship, potential causal relationship. The belief both by the— Well, if you've got to have a causal relationship, that means the clock runs when you can file a lawsuit. That's right. And that's what Florida says, invasion of legal rights. And the Babush case says there can't be any— I understand your point. Thank you, Your Honor. And the time's run. Thank you, Your Honor. Thank you, gentlemen.